# 2006 DTA 25

**TRIBUNAL DE CIRCUITO DE APELACIONES
REGIÓN JUDICIAL DE ARECIBO**

IGLESIA ANTIOQUIA ASAMBLEA DE DIOS, INC.
Recurrente

v.

JUNTA DE PLANIFICACIÓN
Recurrida

Núm. KLRA-05-00885

San Juan, Puerto Rico, a 7 de diciembre de 2005

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Miranda De Hostos y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos, la Iglesia Antioquia Asamblea de Dios, Inc., en adelante, la recurrente, solicitando la revisión de una determinación emitida por la Junta de Planificación de Puerto Rico, en adelante, Junta de Planificación. Mediante dicha decisión, la agencia denegó la Consulta Núm. 2005-08-0543-JPU instada por la recurrente.

Por las razones que expresamos a continuación, se confirma la Resolución emitida.

### I

Conforme surge del recurso de revisión ante nuestra consideración, la recurrente interpuso ante la Junta de Planificación la Consulta de Ubicación Núm. 2005-08-0543-JPU, para la ubicación de un proyecto unifamiliar residencial, en una finca localizada en la Carretera PR-667, Km. 3.6 en el Barrio Bajura Adentro del Municipio de Manatí. Dicho proyecto consistiría de treinta (33) unidades de vivienda de interés social.

Evaluados los documentos obrantes en el expediente, el 31 de agosto de 2005, notificada el 1 de noviembre de 2005, la Junta de Planificación emitió la Resolución recurrida.

Conforme surge del dictamen emitido, la Junta de Planificación, en consideración a la información obrante en el expediente, y de los documentos de referencia, tales como, mapas topográficos, mapas de zonificación vigentes, mapas de zonas susceptibles a inundaciones, estudios de suelos del Servicio de Conservación de Suelos Federal, sistema de información geográfica (G.I.S.) y archivo gráfico emitió las siguientes determinaciones de hechos, las cuales transcribimos *in extenso*:

*"1. Se propone la ubicación de un proyecto residencial unifamiliar para la construcción de 33 unidades de vivienda en solares con cabida mínima de 527 metros cuadrados en una finca de 13.2624 cuerdas, de las cuales utilizarán 5.9092 cuerdas.*

*2. La finca en que se propone el proyecto está delimitada por el Norte, con terrenos del señor Ramón Morán Simó; por el Este, con solar segregado y Carretera PR-667; por el Sur, con solar segregado y terrenos del señor Amador Amador y por Oeste, con terrenos del señor Ramón Morán Simó.*

*3. El proyecto ubica en terrenos B-1, clasificados como Suelo Rústico Especialmente Protegidos (SREP), de alto potencial agrícola. Además, forma parte de un conjunto de fincas apropiadas al uso agrícola por lo que*

*el proyecto perjudicará el potencial de desarrollo agrícola que tiene el sector.*

*4. El proyecto pondría en riesgo la estabilidad ecológica del área en que ubica."*

Véase, Anejo 1 del Apéndice.

En sus conclusiones de derecho, la agencia apuntó:

*"1. Los terrenos objeto de consulta están clasificados como Suelo Rústico Especialmente Protegido (SREP) y calificado como B-1, según el Plan Territorial de Manatí.*

*El Distrito B-1 de conservación se establece para identificar los terrenos con características especiales para la siembra de árboles, para la producción de madera y para la protección de suelo y agua. Las características especiales de estos terrenos se basan en el tipo de suelo, la topografía y la humedad relativa en los mismos. Estos distritos incluyen los terrenos comprendidos por los bosques existentes así como aquéllos recomendados a ser repoblados.*

*2. La Ley Número 81 del 30 de agosto de 1991, según enmendada, dispone que los municipios previo al cumplimiento con una serie de requerimientos, podrán adquirir la capacidad de regular el uso del terreno en su jurisdicción al producir y adoptar un Plan Territorial. El Municipio de Manatí cuenta con un Plan Territorial.*

*No obstante, el Municipio no cuenta con un convenio de transferencia de facultades, por lo que le corresponde a la Junta de Planificación la consideración del caso, como consulta de ubicación.*

*3. De acuerdo a lo establecido en el Reglamento para Procedimientos Adjudicativos de la Junta de Planificación con vigencia 21 de marzo de 1995, compete a la Junta tramitar el desarrollo como consulta de ubicación.*

*4. La consulta propuesta está en desacuerdo con los Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, con vigencia del 31 de octubre de 1995."*

El objetivo 1.00 de este documento es ordenar y guiar el crecimiento físico-espacial de las áreas urbanas. Indica que se descarten para usos urbanos aquello (sic) terrenos donde ubiquen recursos naturales de importancia que sean ambientalmente críticos o donde exista una condición de contaminación ambiental que represente un riesgo a la salud, así como el uso de terrenos sumamente escarpados, susceptibles a erosión, a deslizamientos y de alto riesgo a desastres naturales.

La propuesta ubica fuera del ámbito de expansión urbana y clasificados como Suelo Rústico Especialmente Protegido.

La Ley 81, *supra*, define el suelo rústico especialmente protegido como aquél no contemplado para uso urbano o urbanizable en un Plan Territorial y que por su especial ubicación, topografía, valor estético, arqueológico o ecológico, recursos naturales únicos u otros atributos, se identifica como un terreno que nunca deberá utilizarse como suelo urbano.

El proyecto propuesto es un desarrollo residencial extenso de tipo urbano, por lo cual no está permitido en esta clasificación de suelo.

Por otra parte, la Política Pública 9.01 específicamente hace énfasis en la preservación de fines agrícolas los

terrenos más productivos y detener la lotificación indiscriminada de los terrenos agrícolas en parcelas o fincas pequeñas a los fines de preservar las fincas en unidades de tamaño adecuado para que su operación agrícola sea económicamente viable. Una de las formas en que se logra este fin es desincentivando la construcción de vivienda, principal competidor de los usos agrícolas, en terrenos completamente llanos que son óptimos para la producción agrícola.

4. La Ley Orgánica de la Junta de Planificación Ley Número 75 del 24 de junio de 1975, según enmendada, en el Artículo 11, Inciso 14, autoriza expresamente a la Junta a *"hacer determinaciones sobre usos de terrenos dentro de los límites territoriales del Estado Libre Asociado de Puerto Rico, con sujeción a las normas y requisitos consignados en esta ley o cualquiera otra ley aplicable para tales casos.*

*4. (sic) La Ley Orgánica de la Junta de Planificación dispone que la Junta velará por la conveniencia de evitar desarrollos en áreas que no estén listas para ser urbanizadas, por razones agrícolas, por falta de facilidades y servicios públicos, por su distancia de los núcleos urbanos existentes o por otras deficiencias sociales, económicas o físicas." Id.*

A base de lo anterior, la Junta de Planificación denegó la Consulta de Ubicación instada.

Insatisfecha, la recurrente interpuso reconsideración, la cual no fue acogida por la agencia.

Inconforme, el recurrente acude ante nos, a tenor de la Regla 7 del Reglamento del Tribunal de Apelaciones, 4 L.P.R.A. Ap. XXII - B.

**II**

En su escrito, la recurrente alega que incidió Junta de Planificación al denegar la Consulta de Ubicación, toda vez que la propuesta no cumplía con las disposiciones reglamentarias del Distrito B-1 y alegar que el proyecto no cumplía con las disposiciones del Plan Territorial de Manatí; al descartar las facultades del Municipio de Manatí para programar el desarrollo de viviendas de interés social en el área del Sector Cortés de Manatí; y al señalar que el proyecto no cumple con las disposiciones del documento de objetivos y política pública del Plan de Usos de Terrenos.

**III**

Nuestra facultad de revisión en el campo administrativo, según se conoce, es limitada. Según la doctrina establecida por el Tribunal Supremo de Puerto Rico, las decisiones de los organismos administrativos especializados han de recibir deferencia por los tribunales, presumiéndose su corrección. La revisión judicial de las mismas se circunscribe a determinar si la agencia en el caso particular actuó arbitraria, ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción. *Rivera Concepción v. A.R.P.E.*, 152 D.P.R. 116 (2000); *Mun. de San Juan v. J.C.A.*, 149 D.P.R. 263, 280 (1999); *Franco v. Depto. de Educación*, 148 D.P.R. 703, 709 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64, 134 (1998); *Henríquez v. Consejo de Educación Superior*, 120 D.P.R. 194, 210 (1987).

Por el contrario, si las interpretaciones de la agencia especializada son razonables y consistentes con el propósito legislativo que inspiran los estatutos directivos, el tribunal debe abstenerse de intervenir con las mismas. *Costa, Piovanetti v. Caguas Expressway*, 149 D.P.R. 881, 889 (1999); *Misión Ind. P.R. v. J.P., supra; Com. Seg. P.R. v. Antilles Ins. Co.* 145 D.P.R. 226, 234 (1998); *Rivera v. A & C Development Corp.*, 144 D.P.R. 450, 461 (1997).

La intervención judicial con las actuaciones administrativas, de este modo, ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado, (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba, y (3) si las conclusiones de derecho del organismo administrativo son

correctas. 3 L.P.R.A. sec. 2175; *P.R.T.C. v. J. Reg. Tel. de P.R.*, 151 D.P.R. 269 (2000); *Misión Ind. P.R. v. J. P., supra; Mun. de San Juan v. J.C.A., supra.*

La norma reiterada en cuanto a las determinaciones de hechos formuladas por una agencia administrativa es que los tribunales no deben intervenir con las mismas si están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70, 75 (2000); *Domínguez v. Caguas Expressway Motors*, 148 D.P.R. 387, 397-398 (1999); *T-JAC, Inc. v. Caguas Centrum Limited*, 148 D.P.R. 70, 80-81 (1999).

Por otro lado, la Junta de Planificación es el organismo gubernamental creado con el propósito de desarrollar los recursos humanos, económicos, ambientales y físicos de forma coordinada para crear las condiciones necesarias que propendan al desarrollo integral de la sociedad. 23 L.P.R.A. sec. 62c. Su creación obedece a la necesidad de velar por la ordenada y adecuada utilización de nuestros escasos terrenos y recursos naturales. Art. VI, Sec. 19, Constitución de Puerto Rico; *Mun. de San Juan v. Bosque Real, Inc.*, 158 D.P.R. ___ (2003), **2003 J.T.S. 33**. La Junta de Planificación debe ejercer sus funciones cumpliendo con la política pública del Gobierno de Puerto Rico de *"fomentar la participación de la ciudadanía en el proceso de planificación de Puerto Rico"*. 23 L.P.R.A. sec. 62v(a). Entre los deberes de dicho cuerpo se encuentra el de promover la comprensión pública del proceso de planificación, empleando aquellos medios informativos que estime adecuados. 23 L.P.R.A. sec. 62v(b).

La Consulta de Ubicación es un procedimiento, generalmente asignado a la Junta de Planificación, 23 L.P. R.A. sec. 62j, y se utiliza para la consideración de propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable a áreas zonificadas o, en el caso de áreas no zonificadas, de usos que pudiesen, por su naturaleza, complejidad, magnitud, impacto físico, económico, ambiental y social, afectar el desarrollo de un sector. *Ortiz, Gómez et al. v. J. Plan.*, 152 D.P.R. 8 (2000); *Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; T-JAC, Inc. v. Caguas Centrum Limited, supra; Misión Ind. P.R. v. supra;* véase, 23 L. P.R.A. sec. 62j.

La agencia goza de amplia discreción en este tipo de determinaciones, sujeto a las normas y requisitos consignados en la Ley. *Mun. de San Juan v. Bosque Real, Inc. supra; Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; T-JAC, Inc. v. Caguas Centrum Limited, supra.*

El procedimiento de Consulta de Ubicación ante la Junta de Planificación es de naturaleza adjudicativa. *Misión Ind. P.R. v. J.P., supra; Luán Investment Corp. v. Román*, 125 D.P.R. 533, 547 (1990); *López v. Junta de Planificación*, 80 D.P.R. 646 (1958).

Al adjudicar una Consulta de Ubicación, el Tribunal Supremo de Puerto Rico ha advertido que lo propuesto debe de estar de acuerdo con las recomendaciones del Plan de Usos de Terrenos, del Plan de Desarrollo Integral, Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico, los Mapas de Zonificación, los Mapas de Zonas Susceptibles a Inundaciones, los Planes de Ordenamiento Territorial, los Planes Regionales, el Reglamento de Planificación y otros reglamentos aplicables, el Programa de Inversiones de Cuatro Años, la Ley Núm. 75 de 24 de junio de 1975, según enmendada, conocida como *"Ley Orgánica de la Junta de Planificación de Puerto Rico"*. 23 L.P.R.A. sec. 62 *et seq.* y la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como *"Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991"*, 21 L.P.R.A. § 4001 *et seq., López v. Antonio Roig Sucrs., Inc.*, 157 D.P.R. ___ (2002), **2002 J. T.S. 85**; *T-JAC, Inc. v. Caguas Centrum Limited, supra.*

Asimismo, se tomará en cuenta la localización específica del proyecto, los usos existentes en el sector, la situación de la infraestructura física y social del lugar, los rasgos topográficos, la condición de inundabilidad, la condición del subsuelo, la densidad poblacional, el grado de contaminación del ambiente, la distancia entre los

terrenos y otras condiciones sociales, económicas y físicas análogas. *Id.*

Cuando una Consulta de Ubicación conlleva la variación de las disposiciones reglamentarias sobre usos de terrenos, se requiere la presentación de una solicitud de variación debidamente fundamentada. Si lo que se interesa es un cambio en la zonificación de los terrenos, hay que satisfacer los requisitos legales correspondientes. *Mun. de San Juan v. Bosque Real, Inc., supra; López v. Antonio Roig Sucrs., Inc., supra; T-JAC, Inc. v. Caguas Centrum Limited, supra.*

## IV

Dentro del marco jurídico antes enunciado, procedamos a resolver la controversia de autos.

La recurrente nos plantea que incidió la Junta de Planificación al concluir que el proyecto propuesto no cumple con las disposiciones del Plan Territorial de Manatí. Alega que la agencia clasificó el terreno como suelo rústico especialmente protegido y calificado como B-1, cuando un análisis del contenido del Plan Territorial de Manatí revela que los terrenos del proyecto ubicados en el Barrio Cortés tienen una clasificación distinta. Aduce que el Plan Territorial del Municipio de Manatí señala, en su parte pertinente, que:

*"(d)entro del suelo rústico se distinguen dos categorías: el Suelo Rústico Común y el Suelo Rústico Especialmente Protegido. El suelo rústico común conforme a su definición en la Ley de Municipios Autónomos, es aquél que no es necesario para atender el crecimiento poblacional en los próximos años, pero que tampoco tiene unas características o localización que requiera una protección especial. Parte del suelo rústico ya está ocupado por poblados dispersos, tales como Pugnado, Montebello, Cortés y Guayaney (...) Estos últimos pudieran ser necesarios para la ubicación de usos urbanos, más allá del horizonte de tiempo del Plan Territorial en este momento, si se logra la construcción de infraestructura necesaria."*

Lo anterior, se nos plantea revela que los terrenos ubicados en el Barrio Cortés pueden ser utilizados para propósitos urbanos.

Comencemos apuntando que, en relación con el uso del suelo, el Art. 13.001 de la Ley Núm. 81 de de 30 de agosto de 1991, según enmendada, conocida como *"Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991"*, 21 L.P.R.A. sec. 4001 *et seq.*, establece que los suelos en Puerto Rico son limitados y que es política pública *"propiciar un uso juicioso y un aprovechamiento óptimo del territorio para asegurar el bienestar de las generaciones actuales y futuras, promoviendo un desarrollo ordenado, racional e integral de los mismos"*. 21 L.P.R.A. sec. 4601.

El estatuto en su Art. 13.003 define Plan Territorial como el *"Plan de Ordenación que abarca un municipio en toda su extensión territorial, que enuncia y dispone la política pública sobre su desarrollo y sobre el uso del suelo."* 21 L.P.R.A. sec. 4601. Dichos Planes de Ordenación, conforme el Art. 13.004 de la Ley Núm. 81, *supra*, deberán ser compatibles con las leyes, políticas públicas y reglamentos del gobierno central. 21 L.P.R.A. sec. 4602.

Por su parte, el Art. 13.005 del estatuto establece que el Plan Territorial será un instrumento de ordenación integral y estratégico de la totalidad del territorio municipal. Una de las funciones es dividir la totalidad del suelo municipal en tres (3) categorías básicas: suelo urbano, suelo urbanizable y suelo rústico. Respecto al **suelo rústico,** el artículo dispone que el Plan Territorial **deberá mantener libre dicho suelo del proceso urbanizador**; evitar la degradación del paisaje y la destrucción del paisaje y la destrucción del patrimonio natural; establecer medidas para el uso del suelo de forma no urbana; delimitar el suelo que debe ser especialmente protegido debido a sus características especiales, o establecer planes para el manejo de los recursos naturales o agrícolas. Dentro del suelo rústico, el Plan Territorial establecerá dos (2) categorías, a saber, suelo rústico común y suelo rústico especialmente protegido. El suelo rústico común es aquél no

contemplado para uso urbano o urbanizable en un Plan Territorial debido, entre otros, a que el suelo urbano o urbanizable clasificado por el Plan es suficiente para acomodar el desarrollo urbano esperado. El suelo rústico especialmente protegido es aquél no contemplado para uso urbano o urbanizable en un Plan Territorial, y que por su especial ubicación, topografía, valor estético, arqueológico o ecológicos, recursos naturales únicos u otros atributos, se identifica como un terreno que nunca deberá utilizarse como suelo urbano. 21 L.P.R.A. sec. 4603.

De lo anterior colegimos que conforme lo dispuesto en la Ley Núm. 81, *supra*, el Municipio de Manatí dividió sus suelos en suelo rústico común y suelo rústico especialmente protegido. Asimismo, se desprende del Plan Territorial que dentro del suelo rústico común se encuentra el Barrio Cortés. A tenor con el ordenamiento jurídico se *"deberán mantener libre dichos suelos del proceso urbanizador; evitar la degradación del paisaje y la destrucción del paisaje y la destrucción del patrimonio natural; establecer medidas para el uso del suelo de forma no urbana; delimitar el suelo que debe ser especialmente protegido debido a sus características especiales, o establecer planes para el manejo de los recursos naturales o agrícolas"*. **Los terrenos clasificados como rústico común, como el de autos, no son contemplados para uso urbano o urbanizable en un Plan Territorial debido, entre otros, a que el suelo urbano o urbanizable clasificado por el Plan es suficiente para acomodar el desarrollo urbano esperado.**

La recurrente en su cita del Plan Territorial omite apuntar que cuando dicho documento se refiere a los terrenos que pudieran utilizarse en un futuro para la ubicación de centros urbanos, se refiere a los terrenos inundables cercanos a la Comunidad Boquilla. A tales efectos, el Plan Territorial lee:

*"(d)entro del suelo rústico se distinguen dos categorías: el Suelo Rústico Común y el Suelo Rústico Especialmente Protegido. El suelo rústico común conforme a su definición en la Ley de Municipios Autónomos, es aquél que no es necesario para atender el crecimiento poblacional en los próximos años, pero que tampoco tiene unas características o localización que requiera una protección especial. Parte del suelo rústico ya está ocupado por poblados dispersos, tales como Pugnado, Montebello, Cortés y Guayaney.* **Estos poblados se clasifican suelos rústicos común. Los terrenos no inundables cercanos a la Comunidad Boquilla, también se clasifican como suelo rústico común. Estos últimos pudieran ser eventualmente ser necesarios para la ubicación de usos urbanos, más allá del horizonte del tiempo del Plan Territorial en este momento, si se logra la construcción de la infraestructura requerida."* (Énfasis suplido)

Véase, pág. 118 del Apéndice.

Para efectos de argumentación, independientemente que la Junta de Planificación haya clasificado el terreno en controversia como rústico común especialmente protegido, en vez de rústico común, lo cierto es que en ambos no se contempla un uso urbano o urbanizable.

A su vez, observamos que se desprende del Plan Territorial que los suelos rústicos común del municipio carecen alcantarillado lo cual es una fuente de contaminación del acuífero. (Véase, pág. 138 del Apéndice.) A fin de subsanar esta situación, el municipio ha extendido la red de alcantarillado a estas áreas.

Por otro lado, la determinación de la Junta de Planificación descansó en que el terreno es de alta productividad agrícola. Somos de opinión que lo anterior, solamente, podría ser suficiente razón para denegar una Consulta de Ubicación. La política pública adoptada en nuestra jurisdicción favorece la retención de los terrenos de alta productividad agrícola. *Misión Ind. P.R. v. J.P.*, *supra*. En cuanto al desarrollo agrícola, la Junta de Planificación ha establecido, como parte de su política pública, *"[r]etener exclusivamente para usos agrícolas los terrenos de alta productividad agrícola"*. Sólo se podrá *"[d]estinar estos terrenos a otros usos,... cuando se demuestre que no existen otros terrenos alternos para la ubicación de una actividad no-agrícola que es apremiante y de importancia para el desarrollo del país"*. *Id.* Plantear que, al presente, ciertos terrenos no

están utilizándose para fines agrícolas, no es motivo para soslayar la política pública prevaleciente.

En su segundo error, la recurrente nos plantea que incidió la Junta de Planificación al descartar las facultades del Municipio de Manatí para programar el desarrollo de viviendas de interés social en el área. Se intima que dicho desarrollo de viviendas tiene preeminencia y milita a favor de que se apruebe la Consulta de Ubicación.

La Sec. 19 del Art. VI de la Constitución de Puerto Rico establece: *"(s)erá política pública del Estado Libre Asociado de Puerto Rico la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad..."*. Sobre dicha disposición constitucional, el Tribunal Supremo ha aclarado:

*"Conscientes de esta preocupación, hemos expresado que la Sección 19 del Artículo VI "no se reduce a un mero postulado de principios"* y que, por lo tanto, su importancia *"no debe ser menospreciada". Paoli Méndez v. Rodríguez, supra*, en la pág. 871. Véanse además, *Misión Industrial v. Junta de Planificación I, supra*, en la pág. 729; *Colón Ventura v. Méndez, supra*, en la pág. 9452. La política pública sobre los recursos naturales enunciada en esta disposición constitucional *"[e]s una protección frente al Estado, la sociedad, el gobierno e incluso el hombre...". Paoli Méndez v. Rodríguez, supra*, en la pág. 872. La Sección 19 del Artículo VI, pues, establece un derecho público - común de la ciudadanía - y le impone al Estado el deber de aprovechar, desarrollar y proteger sus recursos naturales en el mayor grado y de la manera más eficaz posibles, para beneficio y disfrute de todos los ciudadanos.

La Sección 19, sin embargo, no establece guías específicas para la implantación de la política pública sobre los recursos naturales. Por lo tanto, le corresponde implantarla a la Asamblea Legislativa mediante la aprobación de la legislación correspondiente. Con este propósito, la Legislatura aprobó, entre otras, la Ley Núm. 9 de 18 de junio de 1970, conocida como la *"Ley sobre Política Pública Ambiental"*. La política pública enunciada en esta ley responde *"claramente"* al mandato de la Sección 19 del Artículo VI. *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 723 (1974) (refiriéndose al Artículo 3 de la Ley sobre Política Pública Ambiental). Y, según lo ordena su Artículo 4, es *"en estricta conformidad"* con esta política pública que se tienen que interpretar, implantar y administrar, *"al máximo grado posible[,]... todas las leyes y cuerpos reglamentarios vigentes"*. 12 L.P.R.A. § 1124 (1997). *Misión Ind. P.R. v. J.P., supra*, a la pág. 173.

A su vez, y conforme reseñado, la Junta de Planificación es el organismo gubernamental creado con el propósito de desarrollar los recursos humanos, económicos, ambientales y físicos de forma coordinada para crear las condiciones necesarias que propendan al desarrollo integral de la sociedad. 23 L.P.R.A. sec. 62c. Su creación obedece a la necesidad de velar por la ordenada y adecuada utilización de nuestros escasos terrenos y recursos naturales. Art. VI, Sec. 19, Constitución de Puerto Rico; *Mun. de San Juan v. Bosque Real, Inc.*, 158 D.P.R. ___ (2003), **2003 J.T.S. 33**. A tales efectos, es la agencia encargada de implantar dicha política pública mediante proyectos de desarrollo que armonicen los intereses de modernizar el país y de conservar un balance adecuado entre los recursos naturales. Lo anterior tiene preminencia sobre otras necesidades. Véase, *Misión Ind. P.R. v. J.P., supra*. Al evaluar la totalidad del expediente, somos de opinión que la Junta de Planificación cumplió con su deber ministerial y no detectamos ni se nos ha probado arbitrariedad por parte de la agencia.

Por último, se nos alega que incidió la Junta de Planificación al determinar que el proyecto no cumple con los Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico. La recurrente arguye que el Barrio Cortés no cumple con ninguna de las características que lo descartarían como un terreno para usos urbanos.

Cabe apuntar que los Planes Centrales, por ejemplo, Objetivos y Políticas Públicas del Plan de Usos de Terrenos de Puerto Rico establecen la política pública sobre una serie de aspectos relacionados con el desarrollo

de los usos de terreno y la infraestructura, así como la conservación de todo Puerto Rico. Esta política pública es de aplicación a todos los *"rincones de Puerto Rico"*. (Véase, pág. 104 del Apéndice). Sus recomendaciones serán observadas tanto por el sector público como al sector privado al desarrollar proyectos específicos. A tales efectos, y conforme surge del propio Plan Territorial del Municipio de Manatí, las políticas centrales establecidas son vinculantes.

Hemos evaluado el expediente ante nuestra consideración y no percibimos error alguno en la determinación de la Junta de Planificación. Lo cierto es que el terreno en controversia, clasificado como B-1, (área de bosque) y se identifica como un terreno que no debe utilizarse como suelo urbano. Asimismo, es un terreno apropiado para uso agrícola. Ante lo anterior, declinamos intervenir con la determinación de la agencia.

Un análisis del expediente ante nuestra consideración revela que la Junta de Planificación examinó y analizó la propuesta a la luz de las disposiciones de leyes, reglamentos y normas de planificación vigentes.

En conclusión, somos de opinión que el expediente ante nuestra consideración contiene evidencia sustancial para sostener la determinación de la Junta de Planificación. Se trata, según hemos apuntado, de un área donde debe concederse gran peso a la determinación formulada por la entidad gubernamental, ya que está envuelta la formulación de política pública sobre la planificación del desarrollo urbano. *Mun. de San Juan v. Bosque Real, Inc., supra; Asoc. Vec. H. San Jorge v. U. Med. Corp., supra; T-JAC, Inc. v. Caguas Centrum Limited, supra.*

## V

Por los fundamentos arriba esbozados, se confirma la Resolución recurrida.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones